**IN THE UNITED STATES DISTRICT COURT**
**FOR THE NORTHERN DISTRICT OF TEXAS**
**DALLAS DIVISION**

| | | |
|---|---|---|
| RIAN HELGASON and CAROLINE CRAWFORD, | § | |
| Plaintiffs, | § | |
| | § | CIVIL ACTION NO. 3:20-cv-01573-S |
| vs. | § | |
| | § | |
| PERRY'S RESTAURANTS, LTD. | § | JURY DEMANDED |
| Defendant | § | |

## DEFENDANT'S RESPONSE TO PLAINTIFFS' MOTION IN SUPPORT OF ISSUING COURT-AUTHORIZED NOTICE TO SIMILARLY SITUATED EMPLOYEES

LIONEL M. SCHOOLER (SBN 17803300)
Jackson Walker L.L.P.
1401 McKinney Ave., Suite 1900
Houston, Texas  77010
(713) 752-4200
(713) 752-4516 (direct)
(713) 308-4156 (Direct Fax)
E-mail: lschooler@jw.com

OF COUNSEL:

BROOKE WILLARD (SBN 24109466)
Jackson Walker LLP
1401 McKinney Ave., Suite 1900
Houston, Texas  77010
(713) 752-4200
(713) 752-4371 (direct)
(713) 308-4171 (Direct Fax)
E-mail: bwillard@jw.com

SCOTT M. MCELHANEY (SBN 00784555)
Jackson Walker LLP
2323 Ross Ave., Ste. 600
Dallas, Texas  75201
(214) 953-6000
(214) 953-6147 (direct)
(214) 660-6672 (direct fax)
E-mail: smcelhaney@jw.com

ATTORNEYS FOR DEFENDANT
PERRY'S RESTAURANTS, LTD.

# TABLE OF CONTENTS

I. SUMMARY OF ARGUMENT ...................................................................................1

II. INTRODUCTION ...................................................................................................1

III. FACTUAL BACKGROUND .................................................................................1
   A. Evidence Supporting Response ..........................................................................1
      1. Description of Evidence ...............................................................................1
      2. Foundation of Evidence ...............................................................................3
      3. Geographical Scope of Motion ....................................................................3
      4. Perry's Discovery Efforts (Requests for Production) ...........................................4

   B. Tip Pool Process ..............................................................................................5
      1. Use of Specialized Terms ............................................................................5
      2. Mechanics of the Tip Pool ..........................................................................6
      3. Unsupported Allegations Underlying Tip Pool Claim .....................................7

   C. The Side Work Process ....................................................................................8
      1. Terms and Definitions:  "Related" and "Unrelated" Side Work Duties ..............8
      2. Terms and Definitions:  The "80/20" Rule ...................................................10
      3. Terms and Definitions:  "Opening" Side Work;  "Closing" Side Work;
         Main Dining Area; Bar Area .....................................................................10

   D. Side Work "Related" to Server Duties ...............................................................11
      1. Individuality of Side Work .........................................................................11
      2. Differences In Bar Area Side Work Assignments ...........................................12
      3. Impact of Customer Activity Upon Side Work Assignments ...........................13
      4. Individualized Nature of Performance of Side Work Duties ............................13
      5. Plaintiffs' Reference to Another Lawsuit .....................................................13
      6. Conclusion ...............................................................................................14

   E. Side Work: "Unrelated" to Server Duties ...........................................................15
   F. Uniforms and Equipment Claim ........................................................................15

IV. ARGUMENT AND AUTHORITIES ........................................................................16
   A. Introduction ...................................................................................................16
   B. Swales Standard as to Notice ...........................................................................16
   C. Impact of Swales Upon Pending Motion ............................................................17
   D. Lack of "Similar Situation" Regarding Related Side Work Claims .........................17
   E. Deficiencies in Proof of Unrelated Side Work Claims ..........................................19
   F. Absence of Admissible Evidence:  Tip Pool Claim ...............................................20
   G. Insufficient Evidence Supporting Issuance of Notice:  Lack of Similar Status
      for "All Servers in Texas" ................................................................................22

V. PROPOSED NOTICE AND SCOPE OF CLASS ........................................................23
   A. Applicable Time Period ...................................................................................23

B. Wording of Proposed Forms .................................................................................24

C. Notice Process .......................................................................................................25

VI. CONCLUSION..............................................................................................................26

## TABLE OF AUTHORITIES

**Cases**                                                                                     **Page(s)**

*Alverson v. BL Rest. Operations LLC*, 2017 WL 5491998 (W.D. Tex. 2017) ............................17

*Atkins v. General Motors Corporation,*  701 F.2d 1124 (5th Cir. 1983) ......................................24

*Berger et al v. Perry's Steakhouse of Illinois, LLC*, Case No: 1:14-cv-08543 .....................2, 3, 14

*Dean v. W. Aviation, L.L.C.*, 17-CV-62282, 2018 WL 1083497 (S.D. Fla. Feb. 28, 2018) ...........................................................................................................................25

*Desert Sun Net LLC v. Kepler*, No. C06-1041P, 2006 WL 3091170 (W.D. Wash. Oct. 27, 2006) ............................................................................................................21

*Groshek v. Babcock & Wilcox Tubular Prods. Div.*, 425 F.Supp. 232 (E.D. Wis. 1977) ........................................................................................................................24

*Lee v. Metrocare Servs.*, 980 F.Supp.2d 754 (N.D. Tex. 2013) ....................................................20

*Malaska v. Saldivar Coastal Servs., Inc.*, No. 2:16-CV-117, 2017 WL 1452584 (S.D. Tex. Apr. 20, 2017) ............................................................................................19

*McKnight v. D. Houston, Inc.*, 756 F.Supp.2d 794 (S.D. Tex. 2010) ...........................................24

*Muhammad v. GBJ, Inc.*, 2011 WL 863785 (S.D. Tex. Mar. 9, 2011) ..........................................24

*Rojas v. Garda CL Se., Inc.*, 297 F.R.D. 669 (S.D. Fla. 2013) .....................................................25

*Saleh v. Valbin Corp.*, 297 F.Supp.3d 1025 (N.D. Cal. 2017) .....................................................25

*Sandoz v. Cingular Wireless LLC*, 553 F.3d 913, 916-17 (5th Cir. 2008) ...................................24

*Stiles v. FFE Transp. Services, Inc.*, 2010 WL 935469 (N.D. Tex. Mar. 15, 2010) ....................21

*Swales v. KLLM Transport Services*, L.L.C. 985, F.3d 430 (5th Cir. 2021) .......1, 16, 17, 9, 20, 22

*Villarreal v. Caremark LLC*, 66 F.Supp.3d 1184, 1187, 1195 (D. Ariz. 2014) *abrogated on other grounds*, *Campbell v. City of Los Angeles*, 903 F.3d 1090 (9th Cir. 2018) ...........................................................................................................25

*White v. MPW Indus. Services, Inc.*, 236 F.R.D. 363 (E.D. Tenn. 2006) .....................................20

*Wombles v. Title Max of Alabama, Inc.*, No. 303CV1158CWO, 2005 WL 3312670 (M.D. Ala. Dec. 7, 2005) .........................................................................21

**Statutes**

Fair Labor Standards Act of 1938, 29 U.S.C. §§203 *et seq*...........................1, 5, 10, 16, 18, 20, 25

29 U.S.C. §256..........................................................................................................23, 24

**Other Authorities**

29 C.F.R. § 531.54 ...........................................................................................................5

29 C.F.R. § 531.56(e)..........................................................................................8, 9, 10, 19

Federal Rule of Civil Procedure 23 ....................................................................................14

Federal Rule of Evidence 801.............................................................................................21

*Tip Regulations Under the Fair Labor Standards Act (FLSA)*, 85 Fed. Reg. 86756
    (Dec. 20, 2020) ........................................................................................................10

*Tip Regulations Under the Fair Labor Standards Act (FLSA): Delay of Effective
    Date*, 86 Fed. Reg. 11632 (Feb. 26, 2021)................................................................10

DEFENDANT PERRY'S RESTAURANTS, LTD. ("Perry's" or "Defendant") submits this Response ("Response") to Plaintiffs' Motion ("Motion") in Support of Issuing Court-Authorized Notice to Similarly Situated Employees. *See **Dkt. No. 42***.

# I.  SUMMARY OF ARGUMENT

Plaintiffs seek court authorization to issue notice pursuant to the Fair Labor Standards Act ("FLSA"), 29 U.S.C. §§203 *et seq*, as to three claims:  the "tip pool" claim; the "side work" claim; and the "cost of uniforms/equipment" claim.  No notice should be authorized because Plaintiffs cannot satisfy the "similarly situated" standard for notice prescribed by the Fifth Circuit in *Swales v. KLLM Transport Services*, L.L.C., 985 F.3d 430 (5th Cir. 2021).  Alternatively, even if the Court decides to authorize notice to any degree, the Court should modify Plaintiffs' proposed notice, consent form, and notification process as set out below.

# II.  INTRODUCTION

Perry's first identifies the evidence supporting the Response and undercutting the Motion (Part III.A.).  Perry's then addresses against the backdrop of *Swales* the "Factual Background" (Part III.B-F.) and "Argument and Authorities" (Part IV) governing evaluation of the three claims at issue.  Part V addresses the "Notice Process."

# III.  FACTUAL BACKGROUND

## A.  Evidence Supporting Response

### 1.  Description of Evidence

1. Perry's submits the following evidence to support its Response:

| Ex. No. | Description |
|---------|-------------|
| A | Declaration of Derek Pearson ("Pearson Decl.") |
| B | Declaration of Greg Grady ("Grady Decl.") |
| C | Declaration of John Dao ("Dao Decl.") |
| D | Document Requests to Plaintiffs |

| Ex. No. | Description |
|---------|-------------|
| E | *Berger et al v. Perry's Steakhouse of Illinois, LLC,* Case No: 1:14-cv-08543 ("Berger Lawsuit"), ***Dkt. No*. 104** (Nov. 2015 Order of dismissal with prejudice of Perry's Restaurants, Ltd.) |
| F | Redlined Draft of Plaintiffs' Proposed Notice; Proposed Consent and Proposed Notification |

2.       These exhibits are included in the Appendix filed with this Response.

3.       Exhibits "A," "B," and "C" are testimonial evidence from the following individuals who have personal knowledge of matters raised in the Response:

(a)       ***Derek Pearson***, Perry's Senior Vice President of Operational Analysis and Quality Control and, prior to June 2019, its Comptroller for more than seven years, *see* Pearson Decl. at p. 1;

(b)       ***Greg Grady***, who served as the General Manager of the Grapevine location between April 2018 and June 2020, following a three-year stint as the General Manager or Assistant General Manager of Perry's Dallas Uptown location, *see* Grady Decl. at p. 1; and

(c)       ***John Dao***, who serves as the General Manager of the Frisco location, following a six-year stint as the Assistant General Manager there since 2014.  *See* Dao Decl. at p. 1.

Between them, Mr. Grady and Mr. Dao have worked personally with both named Plaintiffs and all of the opt-in claimants in this case.  Accordingly, they have personally observed the work of these individuals at either the Dallas Uptown (also known as Dallas #18), Grapevine, or Frisco locations (referred to in the Response as the "**Three Locations**").[1]  *See* Grady Decl. at p. 1; Dao Decl. at p. 1.

4.       As for the remaining Exhibits,

(a)       Response Appendix Exhibit "D" is a duplicate of document requests sent by undersigned counsel to Plaintiffs' counsel in August 2020, pursuant to FED.R.CIV.P. 34; *see* Part III.A.4., *infra*.;

---

[1] Perry's uses the term "**Three Locations**" solely to identify geographical locations where the named Plaintiffs and the opt-in claimants all worked.  It does not concede by this reference the issue of "similar situations" as to these individuals at these Locations, since many of them had unique experiences from each other within their respective Locations.

- 2 -

(b)     Response Appendix Exhibit "E" is a duplicate of the Order of Dismissal of claims against Perry's entered in November 2015 in the Berger Lawsuit, *see* Part III.D.5., *infra*.; and

5.      Response Appendix Exhibit "F" contains redlined drafts related to the potential notice process.  *See* Part V., *infra*.

## 2.  Foundation of Evidence

1.      As members of management, Mr. Grady and Mr. Dao prepared for shifts, managed staff (including staff assignments and duties for all employees, including all servers), and managed any issues that arose during any given shift.  *See* Grady Decl. at p. 2; Dao Decl. at p. 1.  They have also oversaw all restaurant logistics, including monitoring staff, executing all necessary orders, and maintaining paperwork.  *Id*.  The breadth of their involvement has been exemplified by their work schedule; as managers, they have worked an average of five days a week, and several times six days a week.  *See* Grady Decl. at p. 2; Dao Decl. at p. 2.  This intensive schedule meant that they usually opened the restaurant, closed the restaurant, or both.  *Id*.

2.      They have had authority to direct work assignments, supervise employees, and make decisions concerning server coverage of the main dining and bar areas at the Three Locations.  They have also prepared paperwork for payroll.  *Id*.  Their personal observations and personal knowledge thus exceed that of the Declarants, none of whom ever had to work the same number of days or hours as their Managers.  Indeed, Mr. Grady and Mr. Dao both worked at Perry's as servers prior to their promotion to management.  *See* Grady Decl. at p. 3; Dao Decl. at p. 3.

3.      The evidence they provide constitutes specific and unrebutted explanations of matters about which Plaintiffs' evidence only speculates; it also demonstrates that notice should not be authorized.

## 3.  Geographical Scope of Motion

1.      The Motion seeks authorization for a state-wide notice, *i.e.*, a notice to all individuals who have worked as servers at any of Perry's fourteen (14) restaurants located in Texas. However, the volume of the Motion's evidentiary submissions cannot camouflage the fact that the named Plaintiffs and the other Declarants have not been employed at all fourteen (14) of Perry's locations, but rather (with one exception) have worked solely at one (or, in some cases, two) of the Three Locations, all of which are located solely in the Dallas metropolitan area.[2]

2.      As will be shown below, Plaintiffs' own submission belies the fact that their individual situations do not lend themselves to "collective" notice or treatment.

### 4.  Perry's Discovery Efforts (Requests for Production)

1.      In accordance with prior case management directives, *see **Dkt. No**. **16***, Perry's timely issued specific document requests to each Declarant in August 2020 to determine whether **any** Declarant had **any** documentation to support "declared" allegations such as amount of time spent performing side work, or retention of tips by Perry's.  *See **Dkt. Nos**. **24** at pp. 15-16 and 24-4 (Exhibit "D").  None did.

2.      Although not produced to Perry's in advance, Plaintiffs have now replaced their earlier documentation with additional server paystubs (Exhibits "G" and "J"), server job duties and checklists (Exhibit "H") and online server job postings (Exhibit "I").  Even so, these additional submissions fail to identify:  (a) disproportionate or incomplete distribution of tip share proceeds, as alleged in the "tip pool claim"; (b) calculations of time spent performing side work at any time; or (c) assignments to perform "unrelated side work" tasks.

---

[2] To put into perspective the potential burdens and costs that would be imposed upon Perry's if the Court authorized notice, the group of servers who have worked at the Three Locations would potentially include a notice list of approximately 400 individuals, *see* Pearson Decl. at p. 2; by contrast, the group of servers who has worked at any Perry's Texas location could include more than 1,700 such individuals.  *Id*.

## B.  TIP POOL PROCESS

The following information describes elements of the so-called "tip pool" process.

# 1.  Use of Specialized Terms

Because the legal rules and general operation of tip pools may not be familiar, Perry's provides the following glossary concerning the "tip pool claim."

1.    **Tip Pool/Tip Share**.  As authorized by the FLSA and the Department of Labor ("DOL"), each of the Three Locations established a "***tip pool***."  This pool was comprised of a portion of tips contributed during each weekly pay period solely by servers working at each specific Location.  *See* Pearson Decl. at pp. 1-2; Grady Decl. at pp. 2-3; Dao Decl. at p. 2.  Such contributions were made specifically to recognize the efforts of those co-workers employed specifically at that Location who contributed to the quality and comprehensiveness of services provided to restaurant customers, but who were not independently tipped for such efforts.  This tip pool process is also referred to as the "***tip share***," as it represents the proceeds that are "shared" by the servers at a Location with eligible co-workers at that Location.

2.    **Eligible Recipients**.  The co-workers referred to above, who contribute to servers' successful service to customers but who are not independently tipped by customers, include: ***Bussers*** (who help to clear and set up dining tables); ***Runners*** (who help to "run" food from the kitchen to the table); ***Hostesses***; and ***Bartenders***.  These individuals (the "Server Assistants" referred to above) are recognized by the DOL as "***eligible recipients***," that is, employees who regularly and customarily receive tips.  *See* 29 C.F.R. § 531.54.

3.    **Tip Pool Distribution**.  "***Tip Pool Distribution***" describes the process whereby the tip share collected from servers at a specific Location is distributed as part of the weekly payroll process to the eligible recipients at that Location.  *See* Pearson Decl. at pp. 1-2; Grady Decl. at pp. 2-3; Dao Decl. at p. 2.

- 5 -

## 2. Mechanics of the Tip Pool

1.     **DISTINCT TIP POOL ACCOUNTING BY LOCATION**.  Derek Pearson oversees the ac-

counting and payroll functions for each of the Three Locations, and is also a custodian of those

records.  He is personally familiar with all books and records maintained for the restaurants at the

Three Locations, including reports on work performed by, and compensation issued to, employees

who work at each of those locations.  *See* Pearson Decl. at p. 1.  The accounting and payroll records

for each such Location are maintained individually and separately from each other.  This includes

the process for determining contributions by servers at a Location to the tip pool for that Location,

and the corresponding distributions of the resulting tip share to eligible recipients at that Location.

*Id*.

2.     **RESTRICTED DISTRIBUTION OF THE TIP POOL**.  Tip pool recipients at a specific

Location are the only ones eligible to receive such distributions, and are the only ones who have

ever received such distributions at any of the Three Locations in question.  *See* Pearson Decl. at p.

1.  Further, no tip pool contributions from one location have ever been credited or distributed to

eligible tip pool recipients at any other location.  *Id*.

3.     **PAYMENT OF ALL TIP SHARE PROCEEDS SOLELY TO ELIGIBLE RECIPIENTS**. Dis-

tributions at a Location are based primarily upon the amount of hourly wages for hours actually

worked that are guaranteed to be paid to every eligible recipient through tip share at that Location.

*See* Pearson Decl. at p. 2.  If in any pay period there are ever any excess proceeds available to

distribute once all guaranteed wages of eligible recipients at that Location have been covered, then

such excess proceeds are distributed to such eligible participants *pro rata*, based upon the number

of hours they have worked during that payroll period as a percentage of the total hours worked by

all such participants.  *See* Pearson Decl. at p. 2; Grady Decl. at p. 3; Dao Decl. at p. 2.  Perry's has

never retained tip pool proceeds collected from a server who has worked at any of the Three Lo-cations.  *Id.*

        4.      **COVERAGE OF TIP POOL DEFICITS**.  In actuality, weekly excess tip share proceeds have been a rarity at any of the Three Locations.  *See* Pearson Decl. at p. 2.  That is, during any applicable time period, these restaurants have rarely if ever had any surplus money from the tip pool (in excess of guaranteed wage payments) to distribute to any eligible recipient.  *Id*.  Rather, in more than 85-90% of the payroll periods during the applicable time period, Perry's has been obligated to make up a ***deficit*** between amounts contributed to the tip pool by servers at each such Location and corresponding amounts distributed from the tip pool to eligible recipients at each such Location.  *See* Pearson Decl. at p. 2; Grady Decl. at p. 3; Dao Decl. at p. 2.

### 3.  Unsupported Allegations Underlying Tip Pool Claim

        1.      Plaintiffs' tip pool claim "evidence" related to alleged disparities or irregularities in the handling of tip pool distributions is exclusively drawn from speculation and hearsay.  One such example is derived from the Declaration of Plaintiff Helgason:

> Throughout my employment with Perry's ***and from conversations with other co-workers (including, servers and bussers)*** at both locations, I know that Perry's retained a portion of its servers tips, including mine, Crawford's, ***and Opt-in Plain-tiffs'***, that were contributed into the mandatory tip pool. Based on my employment with Perry's ***and conversations with other individuals employed with Perry's (in-cluding, bussers and servers) about the tip pool and tip pool distributions,*** I also know that Perry's paid its bussers a flat hourly wage, regardless of the amount of tips the other servers and I contributed to the tip pool and were purportedly ear-marked for the bussers; and, as a result, ***any tips exceeding the bussers flat hourly rate were not redistributed to the other servers and I*** (sic).

*See **Dkt. No**. **43***, App. 004, Plaintiffs' Exhibit "A" at p. 4, ¶12 (emphasis added) (Helgason).[3]

---

    [3] The "information" provided on this point through the other Declarants is identically worded to that of Declarant Helgason.  *See **Dkt. No**. **43***, App. 009, Plaintiffs' Appendix Exhibit "B" at p. 4, ¶12 (Declarant Crawford); App. 013-014, Plaintiffs' Appendix Exhibit "C" at pp. 3-4, ¶ 11 (Declarant Sharif); App. 018,

2.      Simply put, there is no basis for any Plaintiffs' Declarant's knowledge about operation of the tip pool, nor evidence even to suggest that Perry's actually retained tips, where in fact the absence of distribution of excess tips would have resulted from the fact that there was no surplus money to distribute from the tip pool (in excess of guaranteed wage payments).

## C.  THE SIDE WORK PROCESS

## 1.  Terms and Definitions:  "Related" and "Unrelated" Side Work Duties

1.      Plaintiffs allege there are two different types of side work at issue:

(a)      side work duties that are ***related*** to working at a "tipped" occupation; and

(b)      side work duties that are ***unrelated*** to working at a "tipped" occupation.[4]

2.      Regarding these two types of side work, the core distinctions between them are drawn from a Department of Labor regulation, 29 C.F.R. § 531.56(e), which states as follows:

> (e) *Dual jobs.* In some situations an employee is employed in a dual job, as for example, where a maintenance man in a hotel also serves as a waiter. In such a situation the employee, if he customarily and regularly receives at least $30 a month in tips for his work as a waiter, is a tipped employee only with respect to his employment as a waiter. He is employed in two occupations, and no tip credit can be taken for his hours of employment in his occupation of maintenance man. Such a situation is distinguishable from that of a waitress who spends part of her time cleaning and setting tables,  toasting bread, making coffee and occasionally washing dishes or glasses. It is likewise distinguishable from the counterman who also prepares his own short orders or who, as part of a group of countermen, takes a turn as a short order cook for the group. Such related duties in an occupation that is a tipped occupation need not by themselves be directed toward producing tips.

*See* 29 C.F.R. §531.56(e).

3.      Expanding upon its definition of "related" side work, the Department of Labor developed the following non-exclusive list of such duties:

---

Plaintiffs' Appendix Exhibit "D" at p. 3, ¶ 11 (Declarant Sebikali); App. 023, Plaintiffs' Appendix Exhibit "E" at p. 4, ¶ 12 (Declarant P. Martinez); and App. 028, Plaintiffs' Appendix Exhibit "F" at p. 4, ¶ 13 (Declarant E. Martinez).

[4] In general, the term "***duties unrelated to a tipped occupation***" refers to such regular tasks as cooking food, cleaning toilets, and performing maintenance work.

(1) Take orders from patrons for food or beverages;
(2) Check with customers to ensure that they are enjoying their meals and take action to correct any problems;
(3) Check patrons' identification to ensure that they meet minimum age requirements for consumption of alcoholic beverages;
(4) Collect payments from customers;
(5) Write patrons' food orders on order slips, memorize orders, or enter orders into computers for transmittal to kitchen staff;
(6) Prepare checks that itemize and total meal costs and sales taxes;
(7) Present menus to patrons and answer questions about menu items, making recommendations upon request;
(8) Remove dishes and glasses from tables or counters and take them to kitchen for cleaning;
(9) Serve food or beverages to patrons, and prepare or serve specialty dishes at tables as required;
(10) Clean tables or counters after patrons have finished dining;
(11) Prepare tables for meals, including setting up items such as linens, silverware, and glassware;
(12) Explain how various menu items are prepared, describing ingredients and cooking methods;
(13) Assist host or hostess by answering phones to take reservations or to-go orders, and by greeting, seating, and thanking guests;
(14) Escort customers to their tables;
(15) Perform cleaning duties, such as sweeping and mopping floors, vacuuming carpet, tidying up server station, taking out trash, or checking and cleaning bathroom;
(16) Inform customers of daily specials;
(17) Prepare hot, cold, and mixed drinks for patrons, and chill bottles of wine;
(18) Roll silverware, set up food stations, or set up dining areas to prepare for the next shift or for large parties;
(19) Stock service areas with supplies such as coffee, food, tableware, and linens;
(20) Bring wine selections to tables with appropriate glasses, and pour the wines for customers;
(21) Fill salt, pepper, sugar, cream, condiment, and napkin containers;
(22) Describe and recommend wines to customers;
(23) Perform food preparation duties such as preparing salads, appetizers, and cold dishes, portioning desserts, and brewing coffee;
(24) Provide guests with information about local areas, including giving directions; and
(25) Garnish and decorate dishes in preparation for serving.

*See* 29 C.F.R. §531.56(e).[5]

---

[5] Perry's includes this detailed information because of the significant "disconnect" between DOL standards for "related side work" and the types of side work Plaintiffs are promoting in their Motion as "unrelated side work. That is, Plaintiffs impermissibly seek to transform tasks enumerated by the DOL as "related

## 2.  Terms and Definitions:  The "80/20" Rule[6]

1.      The DOL states in the above-cited regulation that "unrelated" side work and "related" side work are to be treated differently for minimum wage purposes:  "Unrelated" side work must always be compensated at minimum wage or higher; "Related" side work should only be compensated over and above tips and the $2.13 per hour tip credit rate if a server spends more than 20% of a workweek performing such tasks.  This is commonly referred to as the "80/20 rule" (which has not been adopted in the Fifth Circuit).

2.      A policy concerning the performance of "related" side work, standing alone, does not violate the FLSA.  It is only if an individual performs such side work so as to exceed 20% of hours worked during a workweek that a question arises about additional wages owed.

## 3.  Terms and Definitions:  "Opening" Side Work;
## "Closing" Side Work; Main Dining Area; Bar Area

1.      There are additional terms to be defined as part of this Response:

(a)      "*Opening Side Work*" refers to side work assignments performed in preparation for a restaurant's opening, typically at 4:00 P.M.  At the two locations managed by Mr. Grady, there have always been one or two servers who are designated as the "openers."  *See* Grady Decl. at p. 4.  At the location managed by Mr. Dao, openers have been assigned on an equalized rotating basis.  *See* Dao Decl. at p. 3; and

(b)      "*Closing Side Work*" refers to side work assignments performed at specific Locations in preparation of restaurant's closing, usually at 10:00 P.M. on weekdays, and

---

side work," such as resetting chairs and tables, cleaning tables, running food, polishing glassware, cleaning steak trays, and whipping butter to pipe into ramekins, to the category of "unrelated side work."  *See* Motion at pp. 12-13.  Such an effort fails as a matter of law.  As the DOL's pronouncement makes clear, *see* 29 C.F.R. §531.56(e), these duties are actually "related to the tipped occupation," and are not properly excluded from that category solely because they are allegedly not directed toward producing tips.

[6] In discussing the "80/20" Rule, Perry's does not concede its current applicability.  As pointed out in the paragraph below this heading, this "Rule" has never been adopted by the Fifth Circuit.  Additionally, the Department of Labor on December 22, 2020, issued an amended regulation abolishing this Rule.  *See Tip Regulations Under the Fair Labor Standards Act (FLSA)*, 85 Fed. Reg. 86756 (Dec. 20, 2020).  However, the status of that regulation is now in limbo, because new Department of Labor officials have suspended the applicability of that regulation for sixty (60) days.  *See Tip Regulations Under the Fair Labor Standards Act (FLSA)*: *Delay of Effective Date*, 86 Fed. Reg. 11632 (Feb. 26, 2021).

at 11:00 P.M. or later on weekends.  "Closers" denote 2 or 3 servers who are responsible for closing side work assignments at a specific Location and working with the manager to get the restaurant closed.  *See* Grady Decl. at pp. 4-5.

2.      Each of the Three Locations has two principal areas:  the ***main dining area***; and

the ***bar area***.  As these names suggest,

(a)     the ***main dining area*** identifies an area for diners where there are only tables (or private rooms) specifically set up for meal service, and where guests are served by main dining room servers; whereas

(b)     the ***bar area*** identifies an area separate from the main dining area which has a formal bar set up for patrons who wish to order drinks (and food) directly from the bartender, as well as several small tables around the bar where patrons can order food and drinks served by bar area servers.

*Id*.

## D.  SIDE WORK "RELATED" TO SERVER DUTIES

## 1.  Individuality of Side Work

1.      When it comes to side work, individual servers have universally been observed

handling their duties based upon individual work habits, in addition to the fact that their side work

duties differ based upon the "area" in the restaurant where they perform side work.  *See* Grady

Decl. at p. 5; Dao Decl. at p. 4.

2.      As part of their management duties, Mr. Grady and Mr. Dao have overseen server

day-to-day activities, including work on "related side work" assignments.  They therefore have

personally witnessed servers performing such assignments with the following resulting observa-

tions:

(a)     If a server has to perform opening side work and closing side work during the same shift, any closing duties are limited to no more than 10-15 minutes total, *see* Grady Decl. at p. 3; Dao Decl. at p. 3;[7]

---

[7] At Mr. Dao's location, aside from spending about 10 minutes rolling silverware, clearing 3-4 tables at a station, or some other similar closing duty, no server has ever had to perform any other closing side work that took more than about 10-15 minutes to complete.  *See* Dao Decl. at p. 3.

(b)     No one individual server has ever been given more than a few side work tasks to complete at any one time, *id*.;

(c)     No server has ever spent longer than 15-30 minutes completing those tasks, *id*.;

(d)     <u>The only variation observed among servers is that they perform tasks at a different pace from each other</u>, *id*. (emphasis added);

(e)     Even so, servers performing such tasks the slowest usually finish the tasks within 20-30 minutes, *id*.;

(f)     Further, the side work duties for those servers who work in the bar area are different from side work duties for those servers who worked in the main dining area, *see* Grady Decl. at p. 3; and

(g)     Those servers covering the main dining areas have more side work to perform than those in the bar area.  Nevertheless, dining area servers always finished within the time indicated above.  *See* Grady Decl. at pp. 3-4.  *See* note 8, *supra*.

3.     This foundational information is provided partly to address the erroneous impression promoted by Plaintiffs that all tasks identified on a side work assignment sheet are always performed by all servers at every shift.  Their own form, *see **Dkt. No**.* **43**, Exhibit "H" (App. 038-042), belies this assertion.  Different tasks are assigned to different servers at each shift.  Shared side work responsibility avoids disproportionate side work assignments.

## 2.  Differences In Bar Area Side Work Assignments

The two individuals who are named as Plaintiffs in this lawsuit, Rian Helgason and Caroline Crawford, <u>both worked in the bar area under Mr. Grady</u>:  (a) Ms. Helgason worked in the bar area more than 99% of her time; and (b) Ms. Crawford worked in the bar area more than 90% of her time.  *See* Grady Decl. at p. 4.  Therefore, these two individuals in particular cannot be similarly situated to servers who have performed side work in the main dining area; they have had different side work duties, and their side work duties typically required less time to complete.  *Id*.

### 3.  Impact of Customer Activity Upon Side Work Assignments

1.      Plaintiffs' related side work claim ignores a significant variable, the impact of customer activity.

2.      The breadth and intensity of customer activity affects the amount of time that a server may spend on side work.  *See* Grady Decl. at p. 4; Dao Decl. at p. 4.  That is, heavier early customer activity usually has required a server to begin serving customers and waiting on tables very shortly after his or her scheduled arrival.  *Id*.

3.      As a result, this level of customer activity frequently has diminished or eliminated the time any individual server would have to spend on side work assignments, irrespective of in which area of a Location they would have worked.  *Id*.[8]

### 4.  Individualized Nature of Performance of Side Work Duties

1.      The Motion suggests that all of the Declarants are constantly spending all available spare time (if any) performing side work.  That suggestion is not supported by the evidence.

2.      Balanced against the myth of "no down time; never-ending side work activity" is the fact (not acknowledged in the Motion) that some servers actually have not devoted time to, or have not "pulled their weight" when, actually performing assigned side work.  *See* Grady Decl. at p. 5; Dao Decl. at p. 4.[9]

### 5.  Plaintiffs' Reference to Another Lawsuit

---

[8] The phenomenon of customer activity likewise demonstrates "dissimilar situations" for *Swales* analytical purposes.

[9] Servers have frequently been observed meandering about or socializing with other servers, have not used available side work time efficiently or at all.

1.      In their Motion, Plaintiffs have seen fit to insert information from the "Berger Law-suit" filed in 2014 in Chicago (a case in which undersigned counsel represented the Defendants). *See Dkt. No*. **42**, Motion at p. 21-23; ***Dkt. No*. 43**, Appendix Exhibit "L."  They refer to this infor-mation to suggest that it constitutes some form of legitimate evidence as to side work claims.

2.      That is not so:  Perry's was not a party regarding such rulings in that Lawsuit;[10] that Lawsuit was filed in 2014 under both the FLSA and Illinois' Minimum Wage Law (the latter of which permits "Rule 23" class actions), and this case is not subject to Rule 23; and the "evidence" presented by Plaintiffs is irrelevant to the issue to be decided in this case, since Plaintiffs fail to show commonality between this case and the Illinois case.[11]

## 6.  Conclusion

Plaintiffs' generalized, evidentiarily unsupported assertions about being similarly situated for "related side work" purposes and the lack of any details as to time actually spent performing side work, apart from feeling overwhelmed by such assignments, fails to carry their burden.  Any suggestions about alleged burdens and "uniformity" of side work assignments is undercut by the limited amount and type of side work that is actually required or performed, the insular and indi-vidualized approach required of a server to perform such side work, and the differences in side work tasks for those working in different areas of a restaurant.  Thus, servers performing related side work duties are inherently not "similarly situated."

---

[10] Perry's was initially sued in *Berger* in 2014, but was dismissed with prejudice in November 2015, long before any determinations were made by the Court concerning certification.  *See* Perry's Appendix Exhibit "E," ***Berger Dkt. No*. 104.**

[11] This evidentiary flaw also infects Plaintiffs' Appendix Exhibit "H," *see Dkt. No*. **43, App. 038-042,** which purports to contains 5 pages of side work checklists.  This Exhibit in fact indicates solely that servers were assigned specific side work duties during 1 or 2 particular daily shifts, and fails to show any amount of time spent by any server performing side work tasks.

## E.  SIDE WORK: "UNRELATED" TO SERVER DUTIES

1.      Plaintiffs have also failed to demonstrate entitlement to broadly based notice on the basis of performing "unrelated side work duties."

2.      The evidence furnished by Mr. Grady and Mr. Dao on this point is telling, given that both of them worked at Perry's as servers prior to their elevation to management:

(a)      Neither of them was ever requested to perform any unrelated side work assignments such as cleaning toilets, cooking food, or performing maintenance work, except perhaps once or twice on a voluntary basis, nor ever saw a fellow server being required to perform such assignments either;

(b)      Following their elevation to management, neither of them has ever instructed a server to perform side work unrelated to server duties, or is aware of any other manager at any of the Three Locations requesting performance of such side work;

(c)      If for some reason, on a very rare occasion, a server at one of those locations claims to have performed a side work task unrelated to server duties, that would have occurred on a strictly voluntary one-time basis, decided by that individual server; and

(d)      Given their usual coverage at their locations 5-6 nights per week until closing, neither of them ever witnessed a server performing such tasks on a regular basis.

*See* Grady Decl. at p. 3; Dao Decl. at p. 3.

## F.  UNIFORMS AND EQUIPMENT CLAIM

1.      Plaintiffs also seek authorization to issue a notice based upon alleged compelled uniform or equipment purchases.  Plaintiffs have failed to produce adequate evidence of "similar situations" to justify the issuance of notice regarding this claim.

2.      Out of all of the named plaintiffs and the 15 or so opt-ins in this case, Plaintiffs have now produced a total of 5 or 6 weekly paystubs indicating imposition of such a deduction (out of a total of an average of 850 annual paychecks, calculated based upon approximately 50 paychecks per server per year issued to each of these 17 individuals in any one year).

3.      Such a showing demonstrates the individualized nature of this claim and the rare instances, if any, in which a uniform or similar charge has been deducted from a server's paystub. *See **Dkt. No**. **43***, Plaintiffs' Appendix Exhibit "G" (App. 030-037) and Exhibit "J" (087-091).

## IV.  ARGUMENT AND AUTHORITIES

### A.  INTRODUCTION

Plaintiffs' request for authorized notice is inappropriate under the *Swales* standard.  Individual inquiries dominate the landscape of Plaintiffs' side work, uniform deduction, and tip pool claims.  Such a characteristic must be confronted at the outset because *Swales* now obliges a district court to consider the merits of particular claims before authorizing "class-wide" notice.  Alternatively, Plaintiffs' proposed notice, consent form, and opt-in process are inappropriate.

### B.  SWALES STANDARD AS TO NOTICE

1.      In the recent *Swales* ruling, the Fifth Circuit described its decision as prescribing the "legal standard that district courts should use when deciding whether to send notice in an FLSA collective action." 985 F.3d at 439.  The Court:  (a) rejected the two-stage *Lusardi* approach; (b) held that it was improper for a court to ignore evidence of dispositive and threshold matters when deciding a motion to allow notice; and (c) required district courts to identify, at the outset of a case, which facts and legal considerations are material to determining whether a group of employees is similarly situated.  *Swales*, 985 F.3d at 441.

2.      District courts are now expected to "rigorously scrutinize" the realm of "similarly situated" employees at the beginning of the case, not after declaring a "lenient step-one conditional certification." *Id*. at 434.  *Swales* further imposes upon Plaintiffs the burden to first demonstrate that they are indeed "similarly situated" to those claimants they hope to recruit through issuance of a broadly-based notice.

## C. IMPACT OF SWALES UPON PENDING MOTION

1. **MERIT QUESTIONS PROPER AT OUTSET OF CASE**. *Swales* endorses court consideration of merits questions when determining the propriety of collective treatment, or the proper scope of a collective. 985 F.3d at 442. The *Swales* Court further warns that when a district court ignores such merit issues, it "ignores the similarly situated analysis and is likely to send notice to employees who are not potential plaintiffs." *Id*. In fact, it characterizes the act of ignoring such merits questions as running the risk of notice becoming a "claims-solicitation tool." *Id*.

2. **FOCUS UPON INDIVIDUALIZED INQUIRIES**. *Swales* focuses upon the importance of "similar situations" to highlight the seminal risk of authorizing notice in the face of potentially highly individualized inquiries into each potential opt-in's circumstances. Issuing a notice without evaluating such factors risks devolution of a proposed collective action into a "cacophony of individual actions." 985 F.3d at 442.

3. **PROBING SUBSTANTIVE CLAIM ELEMENTS RATHER THAN ACCEPTING "SIMILARITY" LABELS**. *Swales* also impels district courts to eschew "labels" or "job titles" as proof, standing alone, that a group of workers are "similarly situated." In the case before it, the *Swales* Court vacated the district court's order granting conditional certification, *id.* at 443, in part because the group of claimants in that case, all labeled as "truck drivers," actually had "demonstrably different work experiences," given that their hours worked, compensation rates, and length of contracts varied. The Court thus determined that authorizing collective notice was improper. *Id*. at 438, 442.

So it is in this case.

## D. LACK OF "SIMILAR SITUATION" REGARDING RELATED SIDE WORK CLAIMS

1. **INTRODUCTION**. The Fifth Circuit has yet to determine the validity or applicability of the side work rule at all. *See, e.g., Alverson v. BL Rest. Operations LLC*, 2017 WL 5491998,

- 17 -

*17, (W.D. Tex. 2017) (status of 20% rule and dual jobs claims in the Fifth Circuit is "uncertain").[12] Nonetheless, and ignoring the absence of proof of any "policy" requiring servers to spend excessive time performing "related side work assignments," Plaintiffs assert generally without any supporting evidence of time actually spent performing such assignments that Perry's <u>requires</u> Plaintiffs to perform related side work exceeding twenty percent (20%) of their time worked during each workweek.

2.   **INDIVIDUALIZED INQUIRY**.  Perry's contends that rather than demonstrating "similarity" of situations, the admissible evidence under *Swales* demonstrates that the amount of time spent on related side work is an inherently individualized inquiry, and therefore fails to satisfy their burden of showing that their "related side work" claim comports with *Swales*' "similarly situated" standard.  Plaintiffs' assertion of FLSA liability for related side work exceeding 20% (if any) **<u>does</u> <u>not</u> <u>derive</u> <u>from</u> <u>a</u> <u>side</u> <u>work</u> <u>policy</u> <u>but</u> <u>rather</u> <u>from</u> <u>individual</u> <u>decisions</u> <u>and</u> <u>effort</u>**. In fact, the evidence shows that such a claim is too individualized for collective treatment, given that it varies based on:  (a) restaurant location (within the Three Locations); (b) shift worked; (c) location within the restaurant where the server is performing side work assignments (whether main dining area or bar area); (d) the number of servers working; (e) the speed at which any given server accomplishes the side work (as opposed to engaging in socializing or "meandering"); (f) the type of side work to be performed; (g) the level and intensity of customer activity on any given day; and (h) other pertinent factors such as "socializing" or "meandering."

3.   **INSUFFICIENT EVIDENCE**.  Plaintiffs provide no evidence that Perry's has any policy or practice violating the 80/20 rule.  The Declarations of Mr. Grady and Mr. Dao, Response Appendix Exhibits "B" and "C," demonstrate that no server is expected or required to perform

---

[12] Indeed, the legal status of the "80/20" Rule is currently in issue.  *See* Part III.C.2., *supra*.

"related" side work in excess of 20% of time worked during a work week.  Indeed, <u>even</u> <u>when</u> <u>requested</u> <u>to</u> <u>do</u> <u>so</u>, *see* Part III.A.4., *supra*, Plaintiffs have not provided any documentation to demonstrate the amount of side work time they themselves have actually expended.  In short, Plaintiffs have failed to demonstrate sufficiently under the *Swales* standard that related side work duties uniformly or even occasionally take up more than 20% of their work week.[13]

### E.   DEFICIENCIES IN PROOF OF UNRELATED SIDE WORK CLAIMS

1.      **OVERLY BROAD DEFINITION OF "UNRELATED SIDE WORK**."  As demonstrated above, the DOL has provided at least 25 specific examples of side work that is "related" to a tipped occupation.  *See* Part III.C.1., *supra*, *quoting* 29 C.F.R. §531.56(e).  Accordingly, as a matter of law, these pronouncements directly contradict and undercut Plaintiffs' assertion that "unrelated" side work duties include tasks such as resetting chairs and tables, cleaning tables, running food, polishing glassware, cleaning steak trays, and whipping butter to pipe into ramekins.  As a matter of law, these duties are in fact "related" to the tipped occupation at issue, because Plaintiffs' proposed list identifies several tasks performed contemporaneously with core server duties.

Thus, on the merits (as prescribed in *Swales*) it is inappropriate for the Court to authorize issuance of notice regarding "unrelated side work."

2.      **INDIVIDUALIZED INQUIRY**.  Plaintiffs likewise fail to satisfy their burden of showing that their "unrelated side work" claim comports with *Swales*' "similarly situated" standard, given that the evidence shows such a claim to be too individualized for collective treatment.  While Plaintiffs claim they are required to perform work unrelated to their tipped occupation before,

---

[13] This deficiency extends to Plaintiffs' exaggerated effort to extend to other servers their unsupported assertion that servers are "required" to perform related side work in excess of 20% of a workweek.  *See Malaska v. Saldivar Coastal Servs., Inc.,* No. 2:16-CV-117, 2017 WL 1452584, at *4 (S.D. Tex. Apr. 20, 2017) (general allegations that the defendant violated the FLSA are insufficient to establish other similarly situated employees exist).

during, and at the end of their shifts, nowhere do they demonstrate that performing unrelated side work was a regular <u>policy</u> or <u>practice</u> of Perry's, as opposed to individualistic voluntary action unilaterally and intermittently undertaken.

### F.  ABSENCE OF ADMISSIBLE EVIDENCE:  TIP POOL CLAIM

1.  **INTRODUCTION**.  While Plaintiffs assert that they are entitled to issue notice regarding the tip pool claim, even a cursory review of the Declarations reveals that this claim is premised entirely upon speculation and what Plaintiffs claim to have been told by unidentified employees, denuding such claim of support sufficient to carry their burden under *Swales*.

2.  **HEARSAY OBJECTIONS TO DECLARATIONS**.  Declarations submitted in support of a motion for issuance of notice in an FLSA claim must be based on personal knowledge. *Lee v. Metrocare Servs.*, 980 F.Supp.2d 754 (N.D. Tex. 2013); *see White v. MPW Indus. Services, Inc.*, 236 F.R.D. 363, 369 (E.D. Tenn. 2006).  Perry's accordingly objects to Plaintiffs' efforts to support their right to issue notice by relying completely upon inadmissible hearsay.  Each Declarant's inadmissible evidence is identified by Exhibit No., and Appendix Page Reference in ***Dkt. No*. 43** as follows:

| No. | Exh. No. | Declarant's Name | Dkt. No. 43 Page Reference |
| --- | --- | --- | --- |
| 1. | A | Rian Helgason | pp. 4-8, paras 3, 5, 9-11, 13-15 |
| 2. | B | Caroline Crawford | pp. 8-9, 11,  paras 4, 6, 12, 14-16 |
| 3. | C | Sara Sharif | pp. 14-16 paras 4-6, 9-11, 13-15 |
| 4. | D | Dimitri Sebikali | pp. 19-21 paras 5, 10-13 |
| 5. | E | Phylisha Martinez | pp. 23-25 paras 4-6, 10-12, 14-15 |
| 6. | F | Evelyn Martinez | pp. 28-31 paras 4-6, 10-13, 15 |

3.  **ABSENCE OF ADMISSIBLE EVIDENCE CONCERNING TIP POOL CLAIM**.  Focusing specifically on Plaintiffs' evidence about the tip pool claim, Perry's has demonstrated above, *see* Part III.B.3., *supra*, that a cursory review of the "facts" gleaned by Declarants from "conversations

- 20 -

with other servers" reveals that their conclusory assertions are rife with speculation.[14]  This inad-

missible hearsay and speculation of those who were not involved in the processes described per-

meate Plaintiffs' "evidence" presented regarding the tip pool claim.  In contrast to their total reli-

ance on what they were allegedly told about tip pool distributions, no Declarant has produced any

documents supporting the core of the tip pool claim, its focus on Perry's alleged retention of "ex-

cess" tip pool proceeds (despite being requested to do so, *see* Part III.A.4., *supra*).  They thus

cannot possibly know about the results of any tip distribution except based upon what someone

else told them.

On that basis, these core statements derived from unknown co-workers are statements made

out of court offered for the truth of the matters asserted therein.  As such, they constitute inadmis-

sible hearsay under Federal Rule of Evidence 801.  They therefore should not be accorded any

evidentiary weight.  Deflating such declarations by expelling the hearsay within them likewise

shrivels Plaintiffs' request for authorization of issuing notice as to the tip pool claim.

4.    **EVIDENCE JUSTIFYING DENIAL OF NOTICE OF TIP POOL CLAIM**.  In contrast to

Plaintiffs' inadmissible hearsay, Perry's has provided direct evidence about the tip pool process.

This evidence shows there is actually a **deficit** in more than 85-90% of the weekly payroll distri-

butions between the servers' contributions and the money that Perry's has guaranteed to be paid

---

[14] Perry's points out to the Court, in passing, that as the Court can see from these excerpts, the "evidence" submitted by the Declarants on this claim is **nearly identically worded**. Such boilerplate statements should be discounted to the extent that they only assert alleged FLSA violations and do not address at all the underlying basis for such violations.  *See*, e.g., *Stiles v. FFE Transp. Services, Inc.*, 2010 WL 935469, at *3 (N.D. Tex. Mar. 15, 2010) (refusing to grant conditional certification after finding that "each Plaintiffs' declaration [was] close to identical in substance"); *Wombles v. Title Max of Alabama, Inc.*, No. 303CV1158CWO, 2005 WL 3312670 at * 3-4 (M.D. Ala. Dec. 7, 2005) (collective action status denied because plaintiffs' five "nearly identical affidavits" were insufficient to demonstrate that other employees desired to opt in or that plaintiffs were similarly situated); *Desert Sun Net LLC v. Kepler*, No. C06-1041P, 2006 WL 3091170, at * 6 (W.D. Wash. Oct. 27, 2006) (courts give "little weight to such 'cookie cutter' declarations or too vague and conclusory assertions").

to the eligible recipients at the Three Locations. *See* Part III.B.2., *supra*.  Further, on those rare occasions where there has been a surplus between proceeds collected and required distributions, such excess has been paid to the eligible recipients.  *Id*.

Accordingly, the Court should not authorize issuance of notice as to the tip pool claim.

### G.  INSUFFICIENT EVIDENCE SUPPORTING ISSUANCE OF NOTICE: LACK OF SIMILAR STATUS FOR "ALL SERVERS IN TEXAS"

Without waiving the foregoing, Perry's further contends as follows.

1.      Even if the Court were to determine, pursuant to *Swales*, that some form of notice as to certain claims should be issued to potential claimants, Perry's contends that the Declarations submitted by Plaintiffs are insufficient to justify potentially quadrupling the scope of notice in this case.  *See* Pearson Decl. at p. 2.

2.      That is, Plaintiffs' Motion fails to demonstrate that Plaintiffs are similarly situated to "all individuals who worked as a server for Defendant in Texas," since (with one exception) they have all exclusively worked as servers at only the Three Locations.[15]  *See* Grady Decl. at p. 1; Dao Decl. at. p. 1.

3.      This is especially true given the extent to which Plaintiffs support their position based solely upon hearsay.

4.      Therefore, to the extent the Court considers approving issuance of notice, Perry's contends alternatively that Plaintiffs have failed to justify a geographical expansion of this case beyond the Three Locations.

---

[15] *See* **Dkt. No**. **42**, Motion at p. 27.

## V.  PROPOSED NOTICE AND SCOPE OF CLASS

Without waiving the foregoing, if the Court decides to grant Plaintiffs' Motion in whole or in part, Perry's alternatively comments upon the following matters.

### A.  APPLICABLE TIME PERIOD

1.      Plaintiffs request the following wording in their proposed notice to claimants:

All individuals who worked as a server at any of Defendants restaurants **located in Texas** during the three (3) year period **preceding the filing of this lawsuit** and who were paid a direct cash wage of less than $7.25 per hour.

See *Dkt. No*. **42** at page 19 (emphasis added).

2.      In addition to Perry's objection to the geographical breadth of the proposed notice, *see* Part V.B., *infra*, Perry's objects to Plaintiffs' proposed temporal guidepost of a date three years before the date the lawsuit was filed in June 2020.

3.      The Court conducted a Status Conference in this case on February 9, 2021.  *See Dkt. No*. **40**.  The Court expressed during this Conference its preference that the parties re-brief the issues of proper authorization of notice and definition of class claims, in light of the then recent *Swales* decision.  At that Status Conference, the parties discussed the issue of the timing of this additional re-pleading and its potential impact upon the claims of putative class members.  The Court indicated that it would proceed under the timetable specified.

4.      Regarding a "look-back" period, and the law is clear that for those individuals who opt-in to this case (or have already done so), the date of "look-back" is tied to the date of opt-in. *See* 29 U.S.C. §256.  Thus, if the Court does authorize issuance of notice, the same look-back rule should govern those who receive the notice and opt-in as a result.

5.      Perry's therefore strenuously objects to that portion of the wording of the notice proposed by Plaintiffs' counsel, allowing individuals to receive notice tied to a date three years before the date the lawsuit was filed in June 2020.[16]

6.      The Court should therefore establish the applicable temporal parameter as no earlier than the date on which, if at all, it authorizes issuance of the requested notice. *See Sandoz v. Cingular Wireless LLC*, 553 F.3d 913, 916-17 (5th Cir. 2008).

7.      Perry's accordingly contends that any proposed notice should be worded as follows:

> All individuals who worked as a server at ~~any of Defendants~~ **Perry's restaurants** located in **the greater Dallas**, Texas area, during the three (3) year period preceding ~~the filing of this lawsuit~~ **_____, 2021, the date of the Court's approval of issuance of this notice**, and who were paid a direct cash wage of less than $7.25 per hour.

## B. WORDING OF PROPOSED FORMS

1.      **WORDING OF NOTICE: SCOPE OF CLASS**. Perry's challenges the "over-inclusive" wording of Plaintiffs' proposed Notice,[17] and attaches as Exhibit "F" a "redlined" version identifying Perry's' requested form of Notice, restricting those entitled to notice as servers who have worked solely at one of the Three Locations.

---

[16] As a matter of law, Plaintiffs are likewise not entitled to any "equitable tolling" of limitations. It has been well-settled by the Fifth Circuit for almost forty years that the FLSA's limitations provisions, 29 U.S.C. §256, preclude application of the doctrine of equitable tolling. *See Atkins v. General Motors Corporation,* 701 F.2d 1124, 1130 n. 5 (5th Cir. 1983). The mere passage of time from filing to conditional certification does not constitute the sort of extraordinary circumstance justifying invocation of the doctrine of "equitable tolling." *Atkins, supra, citing Groshek v. Babcock & Wilcox Tubular Prods. Div.*, 425 F.Supp. 232 (E.D. Wis. 1977); *see Muhammad v. GBJ, Inc.*, 2011 WL 863785 (S.D. Tex. Mar. 9, 2011) (rejecting request to toll limitations during period between filing of complaint, threshold liability determination, and the issuance of conditional certification); *McKnight v. D. Houston, Inc.*, 756 F.Supp.2d 794 (S.D. Tex. 2010) (same). Accordingly, the date on which each claimant files his or her opt-in claim establishes the date by which to measure the applicable limitations period. In this case, the activity generated by Plaintiffs and their counsel in already recruiting 15 other individual claimants to opt-in demonstrates conclusively that no extraordinary circumstances have prevented timely filing of claims in this case nor prevented Plaintiffs and their counsel from recruiting such participants. *See **Dkt. Nos. 2, 6, 8, 9, 10, 14, 28**, and **29***.

[17] See ***Dkt. No***. **42**, Appendix Exhibits "N," "O" and "P."

2.    **WORDING OF PARAGRAPH 5 OF CONSENT FORM**.   Perry's challenges the wording in the last two sentences of Paragraph 5 of Plaintiffs' proposed form of "Consent to Join FLSA Lawsuit" ("Consent Form"), and requests their deletion.  *See Dkt. No.* **43**, App. 107-110, Exhibit "N," ¶ 5 which states as follows:

> "I further acknowledge that this consent is intended to be filed to recover wages I may be owed by Perry's, whether in the action with Named Plaintiffs *or in any subsequent action that may be filed on my behalf for such recovery*. This consent may be used by the Law Firm in this case *or in any separate or related action against Perry's*." (emphasis added)

3.    Plaintiffs present neither authority nor justification for what amounts to automatic, court-mandated representation by Plaintiffs' law firm of these "solicited" individuals in perpetuity, enabling the law firm to file *seriatim* collective actions or successive individual actions *en masse*. It is improper to require potential collective action claimants to agree to this requirement as a condition of opting in to a collective action.[18]  *See* Response Appendix Exhibit "F."

## C.   NOTICE PROCESS

1.    **NOTICE PROCESS:  IMPROPER IMPOSITION OF COSTS**.   Perry's opposes Plaintiffs' suggestion that it should bear the burden of creating or obtaining after-the-fact contact information about prospective claimants that it does not maintain in the ordinary course of business.  If the Court does authorize issuance of notice, it should only require Perry's to furnish contact information of each potential qualifying claimant already on file, if any.[19]

---

[18] *See Saleh v. Valbin Corp.*, 297 F.Supp.3d 1025, 1037 (N.D. Cal. 2017); *Dean v. W. Aviation, L.L.C.*, 17-CV-62282, 2018 WL 1083497, at *5 (S.D. Fla. Feb. 28, 2018) *citing Rojas v. Garda CL Se., Inc.*, 297 F.R.D. 669, 681 (S.D. Fla. 2013); *e.g., Villarreal v. Caremark LLC*, 66 F.Supp.3d 1184, 1187, 1195 (D. Ariz. 2014), *abrogated on other grounds*, *Campbell v. City of Los Angeles*, 903 F.3d 1090 (9th Cir. 2018). All of these cited authorities required the Plaintiff's counsel in those cases to delete this language from the proposed consent forms at issue.

[19] The Court also should not impose upon Perry's the burden, for example, of issuing text messages to individual claimants.

2.     **NOTICE PROCESS:  IMPROPER AUTHORIZATION.**  Regarding Plaintiffs' request to allow "electronic signatures," Perry's emphasizes the importance of imposing security safeguards on any such procedure to ensure:  that only qualified applicants can participate; that qualified applicants have in fact agreed to participate (such as by notarization or other suitable "third-party neutral authentication"); and that no one individual is submitting "groups" of consents.

3.     **NOTICE PROCESS:  IMPROPER AUTHORIZATION.**  Finally, Perry's objects to Plaintiffs' proposed use of a "website" for any form of communication.  Standard "blast" e-mails can accomplish the same notice purposes intended; and barring a website ensures that those not involved in anything to do with this lawsuit cannot gain access to information about the case nor proprietary information about Perry's outside the control of the Court.

# VI.  CONCLUSION

WHEREFORE, Defendant Perry's Restaurants, Ltd. respectfully requests that the Court deny Plaintiffs' Motion in Support of Issuing Court Authorized Notice to Similarly Situated Employees, or alternatively, that it sustain Perry's objections and concerns about temporal and geographical scope of any proposed group of potential claimants, as well as Perry's objections and concerns notice and consent, and for such other relief as to which it may be justly entitled.

SIGNED this 5th day of April, 2021.

Respectfully submitted,

**JACKSON WALKER L.L.P.**

*Lionel M. Schooler*
_____

LIONEL M. SCHOOLER (SBN 17803300)
*Attorney-in-Charge*
Federal ID: 726
1401 McKinney Ave., Suite 1900
Houston, Texas  77010
(713) 752-4200
(713) 752-4516 (direct)
(713) 308-4156 (Direct Fax)
E-mail: lschooler@jw.com

OF COUNSEL:

BROOKE WILLARD (SBN 24109466)
Jackson Walker LLP
1401 McKinney Ave., Suite 1900
Houston, Texas  77010
(713) 752-4200
(713) 752-4371 (direct)
(713) 308-4171 (Direct Fax)
E-mail: bwillard@jw.com

SCOTT M. MCELHANEY (SBN 00784555)
Jackson Walker LLP
2323 Ross Ave., Ste. 600
Dallas, Texas  75201
(214) 953-6000
(214) 953-6147 (direct)
(214) 660-6672 (direct fax)
E-mail: smcelhaney@jw.com

ATTORNEYS FOR DEFENDANT
PERRY'S RESTAURANTS, LTD.

## CERTIFICATE OF SERVICE

I hereby certify that on this the 5th day of April, 2021, service of the above Defendant's Response to Plaintiffs' Motion Regarding Court-Authorized Notice to Similarly Situated Employees together with its companion Exhibit Appendix has been accomplished through notice of electronic filing per the Federal Rules of Civil Procedure, and also by sending a duplicate of this pleading and companion Exhibit Appendix by electronic mail to counsel for Plaintiffs:  Drew N. Herrmann,    drew@herrmannlaw.com,  Pamela  G.  Herrmann,    pamela@herrmannlaw.com, Herrmann Law, PLLC, 801 Cherry St., Suite 2365, Fort Worth, TX 76102,

*Lionel M. Schooler*
_____
Lionel M. Schooler

- 27 -

28534884v.1